20-13039. Counsel, we're familiar with your case. Obviously, it's the second time around in our court, so you don't have a lot of time this morning. Feel free to get straight to the heart of your argument. We've read your briefs, the authority cited in your briefs, and at least portions of the record. We're probably going to have some questions, and please try to answer those. But pay attention to the traffic lights, and when the red light shines, it is time to finish. If you're answering a question from the court, feel free to finish your answer. If you have rebuttal time, you won't lose it if all you're doing is answering that question. So we'll begin with Mr. Lee. Good morning, and may it please the Court. I am Andrew Lee, here on behalf of AICSA, the appellant. The sole question before this Court is straightforward. In considering a non-domestic arbitration award, can a federal court sitting as one of primary jurisdiction consider U.S. domestic law grounds for vacator found in Chapter 1 of the Federal Arbitration Act? Seven, you may have heard of it. The 11th U.S. Circuit Courts of Appeals have addressed this question in the affirmative. The 11th Circuit stands alone in declining to permit challengers to arbitration awards to rely on FAA Chapter 1 bases for vacator in primary jurisdiction cases. But not only are industrial risk and its progeny at odds with decisions from all other Circuit Courts of Appeals that have considered the issue, in addition, as the panel observed, the 11th Circuit is also out of line with Supreme Court precedent in BG Group v. Republic of Argentina. The BG Group Court assumed without deciding that in proper circumstances domestic laws of vacator apply to non-domestic arbitration challenges. So we don't suggest that BG Group definitively overruled industrial risk and inversiones. It is, however, extraordinarily strong dicta in what it does say. And specifically, Justice Breyer's majority opinion cited and quoted Article 5.1e of the New York Convention to apply the domestic law of the arbitral seat to determine whether to set aside an award. The opinion states that a Federal court faced with a motion to vacate an arbitral award made in the U.S. under the FAA should normally apply the presumptions supplied by domestic law. The opinion then cited to the New York Convention, Article 5.1e, and its language that an award may be set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made. Here, the primary panel opinion by Judge Joplat observed that what happened in industrial risk is that the Court treated all cases of vacator under Article 5 like secondary jurisdiction cases. And quoting, now we know under BG Group that the Supreme Court does not approve of that approach. And while BG Group specifically refers to Article 5.1e, the Supreme Court's 2020 decision in Odukunpu is instructive because it focuses on Section 208, the residual application clause of the FAA Chapter 2. Odukunpu looked at Article 2, Section 3 of the New York Convention and explained that the Convention, in Justice Thomas' unanimous opinion, quote, does not set out a comprehensive regime that displaces domestic law. The Convention requires courts to rely on domestic law to fill the gaps, end quote. As I said, the Odukunpu decision relies on the FAA Section 208, which expressly permits resort to domestic law in the absence of conflict. Your opponent says, in part, that the only way to harmonize the different provisions of the New York Convention is to allow Article 5 to both double as an enforcement recognition regime and a vacator regime. Can you respond to that? Yes, Your Honor. The suggestion that Article 5 deals at all with vacator has been rejected by every scholar that has assessed the question. The language of Article 5, and frankly, in your decision and your opinion, concurring with the panel, Judge Jordan, is very clear that it only deals with secondary jurisdictions, jurisdictions in countries in which the arbitration did not take place or under the procedural laws of which the arbitration did not occur. And so there's no language in Article 5 outside of 5.1e that deal with set-aside and that's a misreading of Article 5 to suggest otherwise. And that's why you can look at Section 208 and if you need that additional language and, of course, it's in the statute says adopted by Congress, Section 208 is as clear as language can be that courts can look to domestic law to fill the gaps, to supply the vacation language or grounds that are not present in the New York Convention. And as in Odukumpu, the Convention is simply silent and Justice Thomas's opinion was assessing a different provision of the New York Convention and looking at Article 2, Section 3, but the phrase that he used is just as applicable in this case as it was there. In Odukumpu, he wrote, the silence is dispositive. So what does Hydroelectrica, I'll refer to them as HSR, say about the Supreme Court's decision in BG Group? In its brief, it ignores the panel's sentiment expressed primarily in Judge Joe Flatt's opinion, but also in Judge Jordan's, that the Eleventh Circuit is out of line with the other circuits and specifically ignores that it's out of line with Supreme Court precedent. It only gives the BG Group decision a single paragraph at pages 29 and 30 of the red brief. And in fact, it ignores Odukumpu completely, doesn't cite it, doesn't mention it. But it's not alone. Amicus also ignores Odukumpu, doesn't cite it, doesn't mention it. And it discounts BG Group as unhelpful. In fact, it suggests that BG Group is simply reciting the briefs and the arguments of the parties in BG Group, and that is simply not true. Justice Breyer's position and statement, dicta or otherwise, is very clear that the domestic laws would apply to fill the gaps. One of the other arguments is that even if the premise that you start from is correct, applying FAA grounds for vacator is somehow in conflict with the Convention's aims. And so therefore, you shouldn't default to domestic law to vacate in a case like this. So the argument that they make is along the lines of this is against uniformity and the idea that in some ways all of the signatories to the New York Convention, all of the various countries that have signed on to it, are believing that uniformity can be achieved, that we're going to have the same grounds for vacator in every country in the world, every signatory that signs onto the New York Convention. And that simply has not been proven out. You have several countries, in your own opinion, Judge Jordan, the United Kingdom, save Scotland, who has applied domestic law. Switzerland, one of the primary seats of arbitration in international circles throughout the world, has applied its own laws to deal with grounds for vacator. The Yusuf case, which was one of the early cases which charted a course separate from what we have in industrial risk, points out that Australia has done this. And then you can go to the primary treatise on the New York Convention, the Vandenberg book from 1981. And he points out that India's High Court has in fact done this as well. So there's lots of examples. One more would be Spain, which has adopted the UNCATRAL rules. The UNCATRAL rules are actually cited in the amicus brief as a suggestion that there is uniformity. But what it really shows is that states that have adopted UNCATRAL, nation states that have adopted UNCATRAL are essentially saying we're going to take A through D of Article 5, Section 1, and flip them. And those will be the sole grounds. But at least there is an adopted local law. Here, Congress has adopted Chapter 1 of the FAA. Chapter 1, Section 10a4 lays out four grounds for vacator that have been expressly adopted by Congress that are the domestic law of the United States that apply in cases of vacator. So uniformity is not, in fact, a stated goal of the New York Convention when, in fact, in its very language, in its text, it suggests that there's a resort to domestic law to supply and fill in the gaps. Now, I'd like to turn the next few minutes to their second issue and briefly deal with the fact that HSR has suggested that the Court can rule in our favor on the legal question of the wrongness of industrial risk and inversionity. Mr. Lee, before you get to that, I have a question about, as you know, Judge Shoflat and Judge Jordan get to the same place that the Court can look to the FAA for vacator reasons, but they get there in different ways. Is there any practical implication of the different rationales in terms of the grounds for vacator that could be considered? I don't think that the differences are that great. So I think that the only difference really is in the suggestion that we see in the Yusuf case, parroted by Areo in the Third Circuit, that somehow Article 5.1e, quote, incorporates the Section 10A4 of Chapter 1 of the FAA. And that word causes problems for Judge Jordan's opinion. And we believe that it's reconcilable in the sense that the word contemplate is what is coming to favor for being used. And it's simply a, I believe, I don't want to discount either of the judge's opinions, but the use of the word incorporate is sort of a semantics battle here. Clearly, the adopters of Article 5, i.e., the Congress, when it adopted the New York Convention, wasn't saying we're going to incorporate Article 10, Section 10A4 of Chapter 1 to supply those domestic filler gaps. There's nothing in the legislative history  of what would fill those in. But you can simply do a literal and textual reading of the New York Convention to see that the domestic gates are, gaps are to be filled by domestic law. So I don't think that there's that big of a divergence between the two approaches. And now, if I may, I want to address the concept that this Court should decide the case on the merits and go ahead and rule that the arbitration, arbitral panel did not exceed its powers, which is the invitation that HSR makes in suggesting the second issue. This is pretty easily dispensed with. There's no disagreement between HSR and IHCSA that the record below is incomplete. In fact, HSR took the position in this Court, prior to the panel argument, that they wanted to strike our recitation of the facts in our brief because the merits were not reached. They said that Judge Scola didn't reach the merits. They are correct. He actually said it's irrelevant, the documents that we sought to put into the record below, because he was deciding the case on the bindingness of industrial risk. And most importantly, the Court directed the parties the issue to brief on, and we followed that direction. And of course, we don't suggest that we should come back and be allowed to brief the second issue. No one wants that. But what should happen here is that the Court should overrule industrial risk and inversiones and reverse the District Court and remand the case back to that Court for consideration of the exceeding powers ground. And with that, I'll reserve the rest of my time. Thank you, Mr. Lee. Mr. Bianchi. Good morning. My name is Jaime Bianchi. I represent Hidroeléctrica Santa Rita, HSR, the respondent at the Lee. This appeal arises from an arbitral award related to a dispute between two Guatemalan companies concerning a canceled hydroelectric plant. The applicable law is Guatemala. And even though the arbitration was seated in the United States, in Miami, there is no question that this award is a non-domestic award falling under Article I, first paragraph. And that's an important point that we're going to be talking about. The question that the Circuit has asked is whether the Federal Court may vacate a non-domestic arbitral award using domestic vacator grounds under Section 10. And respectfully, I'm here to tell the Court that for the last 25 years, your law has been very clear that the answer is no. We know it has been. It's also out of step with every other Circuit to have addressed the question, isn't it? It is. I'm not here to dispute that's the outlier decision, but I'm here to say that it is the correct decision. It's the correct decision under the language of Chapter 2, specifically Section 207. Section 207 very clearly provides that the Court shall confirm an award unless it finds one of the grounds for refusal specified under said convention. The only grounds for refusal are Article V. It does not incorporate domestic law. There was a question that Judge Pryor asked, what's the practical difference between the majority decision and the concurring decision? There's vast practical reasons, and they're very different. Can I ask you a quick question? You just said that Article V doesn't, or, you know, that it doesn't incorporate domestic law. But doesn't Article V specifically at least advert to the possibility that the award has previously been vacated? Right. It's a timing question. It says that if the award is subject to or has been set aside, the Court may, may not, may refuse confirmation or recognition to use the language. Right. So both 207 and Article V refer to arguments in opposition to confirmation. And one argument that you might raise in opposition to confirmation is that this thing has been vacated previously. Correct. And why wouldn't that vacature occur in the ordinary course in the jurisdiction where the arbitral award was made? Okay. I think there's two questions here. We're not debating about what primary jurisdiction is or isn't. The question is, what's the law that the primary jurisdiction will apply? And the question that I would pose to the Court here is that very clearly, when Congress enacted under Chapter 2, the Convention, it made it extremely broad. Right? Other jurisdictions define non-domestic far more narrowly. Cases that are rendered in their jurisdictions are considered domestic awards. In the United States, it's very different until actually March of last year, where we did a carve-out under Chapter 4 of the FAA. We made it the broadest possible interpretation as to what are the kinds of awards that will fall under the Convention. We made it be any award as long as there's a foreign nexus. So now you have a congressional intent. Forget about the Convention for a section. The Convention allows parties under Sentence 2 of Paragraph 1 to define what non-domestic awards would be. We defined it in the United States in the broadest possible language. We make it enormous. And now we're going to say, now that we're going to make all of these awards subject to the Convention, you would basically have the argument that ICSA poses and that Joseph adopts, or vice versa here, would say, we're going to apply domestic vestiture law. That makes no sense. You would have treated those... If Congress had wanted cases rendered in this jurisdiction by foreign entities in some relation to be governed by domestic law, it would have excluded them. That would have been the logical place. Not that you're going to make all of these awards subject to the Convention and then say, oh, wait a minute. When you come for a vacature, we're going to apply domestic law. And that creates an enormous problem. The consequences, the practicality questions, which is really what we should all be focused on here. That practicality question's different. If you do a domestic arbitration under Section 10, right, if you win, you can get it confirmed. It's, to use the language or the analogy used by the concurrence, it's the opposite side of the coin. But here it would be different. In this situation, you would have to go first through all of Section 10 and then go through Article 5 to get it confirmed. You would have to do it twice. So think about that for a second. But that's only if the loser moves to vacate. Correct. The loser doesn't always move to vacate. Well, but in a primary jurisdiction, right, if it's rendered in the United States, the loser would have to move to vacate. No. Well, if— Just move to deny enforcement or recognition under one of the provisions set forth in the Convention. But, Judge Jordan, just using the Joseph case, which is the Toys R Us case, let me just call it that for ease of language here, the Toys R Us case out of the Second Circuit. In that case, you had competing motions to vacate and motions to confirm because this was the jurisdiction, New York was, with primary jurisdiction. So Toys R Us moved to vacate the decision and then you had Joseph moving forward to get it confirmed. In that situation, you have, like, I forgot the language here. It's the double executor, but by another name. We would have to do it twice. You're going to have to run through all the grounds of Section 10 and then run all through the grounds of Article 5. Surely that is not the purpose of the Convention, to make domestic awards easier to enforce than non-domestic ones. And, in fact, it violates not only the spirit of the Convention, it violates potentially even the language of the Convention under Article 3. I mean, Article 3 says you're not going to treat domestic awards any easier. Or let me say it the other way. You're not going to treat any Convention award any, under terms for enforcement, any more onerous than you would treat domestic ones. So — Have these problems occurred in all the circuits that — that interpret the law differently than this circuit has so far? Well, Judge Grant, what we end up seeing is an articulation of — you look at all those cases, right? A lot of them don't deal with our situation. A lot of them do talk about primary and secondary, and that's not really our fight. Our fight is, what is the law that applies? The only case that really puts the oars deep into the water, trying to give it some analysis, is Judge Joflat's decision in industrial risk, and it's — it's the Toys R Us opinion. Those are the only two that you will read that were — there's actually anyone going deep into the — into what we're talking about here. And what I would ask is, you're right, you are an outlier decision. I'm not going to say you're the majority. I'm just saying, in this situation, in where, in particular, you are — this circuit's law, I should say, not you, but this circuit's law is the correct one. It's the only one that does justice to both the language, respectfully, the structure of both — of both the convention and Chapter 2, and also applies — and I'll put this — a great element of practicality and common sense to the situation. So can I just follow up? Because I think I understand your practicality and common sense arguments. I'm not sure I understand your language and structure arguments at all. So the language of 208 says that Chapter 1's provisions apply absent a conflict, right? Correct. So what's the conflict? I don't think I understand. The grounds that are under Article 5 and the grounds that are under Section 10. But the grounds for Article — under Article 5 are for opposing enforcement. It says nothing about vacature, except that it goes on to say a reason not to enforce might be that it's previously been vacated. Now, Section 10 speaks to vacature. That is correct. Section 10 does speak specifically to vacature. But look at the construction of both provisions, Chapter 1 and Chapter 2, right? We're looking at the domestic law. Chapter 1 governs domestic arbitrations. Chapter 2 governs foreign. For a second, under — under Section 10 — rather, Section 9, it says — the language is very specific. The more — the court must grant an order, a confirming award order, unless the award is vacated, modified or corrected as prescribed by Sections 10 or 11. What does Section 207, its corollary in Chapter 2, say? It says a court shall conform — confirm the award unless — no exceptions — unless it finds one of the grounds for refusal — for refusal specified under said convention. And it's one of those grounds that the award has previously been vacated? Well, it would be — Isn't that what Article 5 says? Well, no. Well, I would say that would be one of the grounds to refuse recognition. But what we're talking about is vacature, right, or setting aside. The grounds that are provided for under — under — and by the way, it speaks of May, and we'll pick up — you pick up on some of the exceptions that are out there because there could be other decisions out there in other jurisdictions vacating an award that, for example, if the United States were the primary jurisdiction, we would say, we don't follow that, right? We're the grounds for — for purposes of setting aside. But my point would be is very clearly, when you look at the structure of both chapters, which both have equal dignity as laws passed by Congress, they parallel each other. Why are we going to interpret them so different? There's no — no one can answer — there's no answer in a — it says brief to that point. There's no answer to the point if you follow the — the majority decision and the — and the decision below, you end up with either — pick your language, right? It does no justice to the language of the provision. It either says it incorporates Section — domestic law when there's no language of incorporation in the article or in the convention. The other argument is it's nestled like it were some — I mean, where — where does that come from? Now — With contemplates, right? I mean, that — that strikes me as that it — it sort of captures exactly what the language is. Well, it does contemplate domestic law. I would agree with the opinion with the — with the concurring opinion in that regard. It does contemplate domestic law. But what domestic law? Not Chapter 1 that deals with domestic arbitrations, but Chapter 2. And you would go to where in the provisions it speaks to it. 207. 207 doesn't give independent grounds incorporating domestic law. So then — so then you're left with a situation of 207 that says the court shall confirm unless grounds for refusal, which, using normal language, one would think those would be grounds for setting aside. Grounds for refusal are found in Article — in Article 5 or — right? And then the next part that you're left with is you're left with a residual clause under — under Section 208. No one's drawing an argument with the Supreme Court's case that — that you can look to domestic law like the Supreme Court did about whether or not there's an enforceable arbitration provision. That's not the issue. That's a — that's a side issue. What we're talking about here is the Convention specifies the grounds for recognition and enforcement. And the Convention also says that these are supposed to be uniform and streamlined. And now, by — Alito, is there a way to think about the Convention that makes recognition and enforcement in a secondary jurisdiction the primary motivator for the Convention itself and leaves vacator to the primary jurisdiction? You wonder — and I'm — I'm no arbitration expert, but you wonder how many countries would have signed on if they had been told you no longer get to decide the grounds for vacator — vacature of an award issued in your jurisdiction. I agree with what you're saying, 100 percent. But this is the — this is the part that's missing in the analysis, is how did Congress enact the Convention? It made all domestic awards — oh, excuse me, strike that — all non-domestic awards subject to the Convention. Other jurisdictions — England and Wales makes cases — decisions rendered there, even though they deal with foreign parties, to be domestic arbitration, and that's why their domestic arbitration law applies. The United States, when it enacted it, enacted it broadly. It defined as non-domestic any award rendered in this country. And I — so I don't have to keep repeating myself. That has been slightly changed in March of last year when they did Chapter 4. So I want to make sure that we acknowledge that. Because I think it even makes the point, when Congress wants to take something out of the international arbitration world, it knows how to do it. They just did it under Chapter 4. They said, we don't care if it's a non-domestic award. You're not going to get enforced in the United States. So, yes, the Convention does contemplate enforcement and recognition. But when Congress enacted it back in 1970 or 68, whatever the year was, when Congress enacted it, it enacted it in the broadest possible way by making all of those awards subject to the Convention. And until very recently, that was the law. When we're dealing with treaties and the New York Convention is, in essence, a treaty, we can look to the way other countries who are signatories have interpreted that same treaty. Have any other countries taken the reading of the Convention that you advocate here? In all candor, I would say, I didn't look for that, what countries had or hadn't. But what I did discover was, by looking at the same commentators that everyone cited here is, you will see that the domestic law of those jurisdictions, and I give the example of England and France, that's one example that's used by Born, who's one of the leading lights, by the way, in international arbitration, saying that the 11th Circuit law is the correct law, by the way. So just so you feel comfortable about that, for whatever it's worth, the leading arbitrating light in the United States says that you're right on this point. But beyond it, what I'm trying to get to is, you would need to look at each of those domestic jurisdictions to see how they treated awards rendered in their country. Did they treat them as non-domestic awards as provided by in the second sentence of paragraph 1 of Article 1, or does it treat it as domestic awards? That's what the question would have to be. So that's why I have problems just looking at other countries and saying, oh, other countries interpret the Convention differently than we do, we meaning the 11th Circuit law must be wrong. I would say look at the language of Chapter 2, the broad language, incorporating all non-domestic awards as being subject to the Convention. It makes no sense that you're going to make all of those awards subject to the Convention and then step back and say, oh, wait a minute, we're going to apply domestic Section 10 grounds and not Article 5. It makes no sense from a statutory interpretation perspective. The language of 207 is very clear on the point, and I would also say the practical effects of the consequences of either reading it the Toys R Us way, which sort of nestles in or contemplates or incorporates whatever language you want to use for it, makes it, think about it, it makes to confirm an award, you would have to run the gamut. If you use the Toys R Us mindset, you would have to run the gamut. You would have instead of having the four grounds that Section 10 contemplates, you would have 11 grounds that you would have to deal with. Or if we do it at the way the concurrence argues, you would have to first run through Section 10, and then if you do a domestic, and this is like the — this is the part that really the practicality of the concurrence is this, is if you think about it, we all know that if you do a domestic arbitration and you contest it and you win, as the counterparty, the party that's objecting to the motion to vacate, you can move to just have your award confirmed. That's it. Because it's basically like, like essentially collateral estoppel. You can't really litigate the point. But that wouldn't be the law if you have a non-domestic award. In that situation, you have the exact opposite. Then you would have to run through the gamut again through Article 5. It's almost like, it's like you have to do it twice. And there is one thing that's very clear. If the convention was designed to do anything, it was to streamline the process to get awards enforced, not to make them more difficult. I want to make sure we really, I will also say this, on the issue of stare decisis. The law is very clear and this circuit is now become, I guess hotbed would be a bad word because it has a negative connotation, but it's certainly become a center for international arbitration. And the reason that it gets picked is because the law in the 11th Circuit has been very clear for a very long time. And that is that Article 5 is the sole grounds to enforce or invalidate or set aside an award. Say anything about set aside or invalidate? I mean, I think we're getting sort of slippery with our terminology here. I think there's a difference between refusing to confirm and vacate, right? Well, certainly not under domestic grounds, right? They're the mirror image of each other, right? So does Article 5 say anything about vacate? No, Article 5 doesn't, but certainly Chapter 2 does because Chapter 2 dictates that the court shall enforce or confirm an award unless it finds grounds for refusal to do so. It's previously been vacated. But that would make sense in a secondary jurisdiction kind of analysis, which isn't really implicated here. We were talking about his primary jurisdiction, right? We're not talking about it's a timing question. It's if you're moving as a second, if this were the secondary jurisdiction and it's been invalidated in its forum jurisdiction, that would be a reason why a court wouldn't confirm it. But that's what it speaks to. Let's not make it, you know, it's like a let's not make the close, you know, it's too tight to make it an incorporation of domestic law. What it basically is is a timing question. And I think the footnote acknowledges that. The real question really is going back to the issue of stare decisis. I would say this, and I just want to finish this thought for a sec. The key point is this. We've incorporated the law. It's been used in multiple, multiple arbitration agreements that have been seated in this jurisdiction. You're contemplating changing the law drastically. If you look at the brief IHCSA on page 8, they say that the that they're consistent. The grounds under 10a4 and under, I guess, Article 5.1c are consistent. Well, if they're consistent, why are we here? If the result's going to be the same. If you go to different things, if you refuse to recognize or confirm an award as a secondary jurisdiction, that doesn't prevent the parties from attempting the same thing in another secondary jurisdiction, for example, where assets might be located. If you're the primary jurisdiction and you vacate, that award is gone. Well, it could be wrong. It could be gone. Not necessarily always. It could be, because Article 5 speaks Let me say this. If that were solely if that were the issue, then it's broader, because we're not really talking about secondary jurisdiction in this case. We're talking about primary jurisdiction. So the question between the difference between changing the law, it makes very little difference. And under your stereo decisive principles, I'm at times running out, you shouldn't change. And I think I'll let it at that unless. Okay, Mr. Bianchi, I think we understand your argument. Thank you. Mr. Lee, you've saved five minutes for rebuttal. Thank you, Your Honor. I want to start off where Mr. Bianchi ended on this question of stare decisis. This court has some cases that talk about stare decisis, but it is not shy about overruling as an en banc court panel decisions that are wrong. And the industrial risk cases are wrong. And Chief Judge Pryor, you in Smile Direct in your concurring position pointed out that if the case is an outlier among the circuits, it's particularly ripe for overruling. And that's. I'll say specifically not about principles in other cases, but about the reliance interests that I think have been cited here about the contracts that have already been formed with this in mind. Why isn't that creating too much of a problem in this circumstance? Yes. Well, Judge Grant, as far as we know, that's purely anecdotal. There's no citation to any scholarly article in HSR's brief or to any evidence whatsoever that contracts have been written based upon the 11th Circuit precedent industrial risk. In fact, as the scholars point out. But why do we need to have any kind of a law review article on that? I mean, isn't that the whole point of reliance is which is if you know what the law is and the law is X and it's been X for 30 years that people make and enter contracts based on what the law is and their expectations. The problem, Judge Ligo, is it doesn't overcome if it is wrong. So if the law is wrong, then you rely upon it. That's not a strong enough interest to respect stare decisis. The courts have said that. But I would also point out that the suggestion and it's their burden to suggest that the stare decisis should control here that reliance has occurred has to have some basis to it. And isn't it always the case whenever we go on bonk and we're reconsidering our precedent that we have to worry about reliance interests? I mean, isn't that always going to be the case? And if that's always the case, then we would never correct our law if we thought it was wrong, right? That's correct. And certainly for a party in HSR's position to come in and suggest that that's the sole reason why you ought to continue this wrong precedent, they need to come up with something more than they have. And all they have seemed to me that the flip side of calling this reliance interest is to suggest that by being an outlier, if what your adversary is saying is true, what it really is doing is highlighting how that lack of uniformity may be producing unjust forum shopping. Correct. If you're forum shopping on the basis of a wrong precedent or on the Eleventh Circuit being the outlier, then there's no justice in that. There's no suggestion that that should continue. For as long as they want it to continue. And I would also point out, just in terms of this closing the book on this subject, their citation to Miami being a hotbed of arbitration, certainly that's correct. But we did cite to an article from 1977 that said, we're trying to create Miami as a hotbed of arbitration and here's how we're going to do it. And the factors that they cited had nothing to do with the precedent of this Court. They had to do with the bilingual culture, with the bilingual professionals, with the bilingual experts, with the gateway to Latin America, all of the obvious things that were the reason why Miami is continuing to thrive and will thrive as an arbitration seat. I want to touch briefly on the meat of Mr. Bianchi's argument about how Section 207 is somehow the domestic law that the Court should look to. And that, of course, ignores that Chapter 2 is the enactment of the New York Convention. That is not domestic law. The suggestion that Section 208 says that you have to look only within Chapter 2 to find the domestic law and don't look to Chapter 1, that should have been more clear. Nonetheless, Chapter 2 is the enactment. That's where the Congress said we're going to enact the New York Convention. There's no domestic law there to point to. And then I want to just correct one thing that Mr. Bianchi said. He said we didn't touch on the question of whether this argument about symmetry between 207 and Section 9. Now, he didn't mention Section 9, but he did in the brief and in Section 9, you have the confirmation provision for Chapter 1, the corollary to Section 207 in Chapter 2. You also have Section 10 in 209, but there's no corollary in Chapter 2 to Section 10. There's no domestic vacatur grounds. There's no vacatur grounds. I think as we've established and as Mr. Bianchi conceded, that Article V doesn't talk to vacatur at all. So you don't even have a provision in Chapter 2 for vacatur. This is pointed out very clearly in Judge Jordan's concurring opinion, quoting here from page 1307. No provision of the New York Convention identifies procedures, requirements, or grounds for vacatur. So where are you to look? According to Mr. Bianchi, you look at Chapter 2, but that's the enactment provision. I appreciate everyone's time. Thank you, Your Honor. Roberts. Thank you, Mr. Lee. We have your case, and we are adjourned.